**GOLDSMITH & MENDOZA P.L.L.C.**
1670 E. River Road, Suite 200
Tucson, Arizona 85718
Main/Facsimile: (520) 497-1138
Eugene N. Goldsmith; eng@goldsmith-mendoza.com
ASB No. 010254/PCC No. 21332
Maria del Pilar Mendoza pm@goldsmith-mendoza.com
ASB No. 024740/PCC No. 65959
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Florence Truesdell, a married woman,<br><br>Plaintiff,<br><br>v.<br><br>United States of America, a body politic; and El Rio Santa Cruz Neighborhood Health Center, Inc, an Arizona non-profit corporation, d/b/a/ El Rio Community Health Center; El Rio Foundation Inc., an Arizona non-profit corporation, d/b/a El Rio Community Health Center,<br><br>Defendants. | NO.<br><br>**COMPLAINT**<br><br>**(Jury Trial Requested)**<br><br>**Assigned to: Hon.** |

Plaintiff Florence Truesdell ("Ms. Truesdell"), for her claims against Defendants United States of America ("United States"), El Rio Santa Cruz Neighborhood Health Center, Inc. and El Rio Foundation, Inc. (collectively "El Rio"), alleges the following:

## JURISDICTION AND VENUE

1. This action arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* and the Public Health Services Act, as amended by the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 201, *et. seq.*

2. In regard to Ms. Truesdell's claims, against Defendant United States, this Court has jurisdiction over the subject matter, pursuant to 28 U.S.C. § 1346(b).

3. In regard to Ms. Truesdell's claims, against Defendants El Rio, this Court has jurisdiction over the subject matter, pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), as substantial parts of the acts or omissions giving rise to Ms. Truesdell's claims occurred in Tucson, Arizona, within the District of Arizona.

## PARTIES

5. At all times relevant hereto, Ms. Truesdell was, and is, a resident of Tucson, Arizona.

6. Defendant United States is a body politic.

7. Defendants El Rio are Arizona non-profit corporations, conducting business within the State of Arizona.

8. At all times relevant hereto, Defendants El Rio have received federal grant funds, pursuant to 42 U.S.C. § 254b.

9. At all times relevant hereto, the United States Department of Health and Human Services deemed Defendants El Rio as employees of the Public Health Service ("PHS"), pursuant to 42 U.S.C. §§ 254b, 233(a) and (g).

10. In particular, Defendants El Rio were deemed PHS employees for the calendar year 2020, under Grant No. H80CS00230.

11. At all times relevant hereto, Defendants El Rio were providing medical or related functions, while acting within the scope of their employment.

12. The acts and omissions giving rise to Ms. Truesdell's claims are related to the grant-supported activity of Defendants El Rio.

13. Defendant United States is, therefore, liable for El Rio's acts or omissions, pursuant to 28 U.S.C. § 2671, *et. seq.*; 42 U.S.C. § 201, *et. seq.*

## ADMINISTRATIVE REMEDIES

14. On or about September 10, 2021, Ms. Truesdell submitted a claim to the United States Department of Health and Human Services, pursuant to 28 U.S.C. § 2675, regarding her personal injuries, caused by Defendants El Rio.

15. Six months have passed since the date that Ms. Truesdell submitted her claim, without final disposition by the Department of Health and Human Services. Ms. Truesdell may, therefore, treat her claim as denied. As a result, this action is timely, pursuant to 28 U.S.C. § 2675(a).

## DEMAND FOR JURY TRIAL

16. Ms. Truesdell hereby demands a jury trial.

## FACTUAL ALLEGATIONS

### *El Rio Incorrectly Dispenses Lamotrigine*

17. Ms. Truesdell began receiving medical treatment and pharmaceutical services from El Rio in 2018.

18. At all times relevant hereto, Ms. Truesdell suffered from high blood pressure and was prescribed the drug Labetalol to control that condition.

19. Ms. Truesdell used El Rio to fill her prescriptions, including the Labetalol prescription, from approximately 2018 through July 2020.

20. In June 2020, Ms. Truesdell's Labetalol prescription required her to take two 200mg tablets, twice per day (800mg of Labetalol per day).

21. On or about June 15, 2020, Ms. Truesdell refilled her prescription at El Rio's Southeast Pharmacy, located at 6950 E. Golf Links Road in Tucson, Arizona.

22. Ms. Truesdell's husband, Billy Truesdell ("Mr. Truesdell"), picked up the prescription the following day.

23. The prescription bottle provided to Mr. Truesdell provided Ms. Truesdell's name, the name of the prescribed drug (Labetalol), and the prescribed dosage.

24. The prescription bottle accurately labeled Ms. Truesdell prescription and appeared to be a correct refill of Ms. Truesdell's prescription.

25. That prescription bottle, unknown to Ms. Truesdell, contained a different drug, called Lamotrigine.

26. The Federal Drug Administration ("FDA") has affixed a "black box" warning to Lamotrigine.

27. The FDA affixes a black box warning to drugs that carry serious safety risks.

28. The FDA has affixed the following black box warning to Lamotrigine:

> LAMOTRIGINE tablets, for oral use Initial U.S. Approval: 1994 WARNING: SERIOUS SKIN RASHES See full prescribing information for complete boxed warning. **Cases of life-threatening serious rashes, including Stevens-Johnson**

4

**syndrome and toxic epidermal necrolysis, and/or rash-related death have been caused by lamotrigine**. The rate of serious rash is greater in pediatric patients than in adults. Additional factors that may increase the risk of rash include: coadministration with valproate, exceeding recommended initial dose of lamotrigine, exceeding recommended dose escalation for lamotrigine. (5.1) Benign rashes are also caused by lamotrigine; however, it is not possible to predict which rashes will prove to be serious or life threatening. Lamotrigine should be discontinued at the first sign of rash, unless the rash is clearly not drug related.

29. Ms. Truesdell did not know or have reason to know that El Rio had incorrectly dispensed Lamotrigine when it refilled her prescription.

### Ms. Truesdell Unknowingly Takes Lamotrigine

30. On or about June 17, 2020, the day after Mr. Truesdell picked up the refilled prescription, Ms. Truesdell went to take her morning dose of Labetalol.

31. Ms. Truesdell noticed, when she opened the bottle, that the tablets looked sightly different that the tablets she usually received. Ms. Truesdell, however, believed, from past experiences, that the difference in appearance was due to a change in manufacturers.

32. Ms. Truesdell proceeded to take two tablets of what she believed to be Labetalol.

33. Ms. Truesdell, in fact, had taken two tablets of 200mg Lamotrigine.

34. By midday, Ms. Truesdell felt unusually tired, had difficulty speaking, and developed slurred speech.

35. Ms. Truesdell worked from home as a telephone customer specialist for Citibank. Ms. Truesdell's condition, however, caused her to stop her work.

36. Later that day, Ms. Truesdell took her evening medications, which included a second dose (an additional two 200mg tablets) of Lamotrigine.

37. On June 18, 2020, the following day, Ms. Truesdell, again, in the morning, unknowingly took 400 mg of Lamotrigine.
38. Ms. Truesdell went to attend work, but her slurred speech worsened throughout the day. She also developed a stutter and had difficulty remembering words and details.
39. Ms. Truesdell's condition, again, prevented her from finishing her job duties. She, therefore, used her paid time off to rest from June 19 to June 22, 2020.
40. Throughout that time, Ms. Truesdell continued to take her medications, which included the Lamotrigine.
41. During that time, Ms. Truesdell remained in bed, while Mr. Truesdell brought her food and water. Ms. Truesdell felt dizzy and weak, and needed Mr. Truesdell's assistance to move throughout their home.

## *Ms. Truesdell is Admitted to the Hospital*

42. On the night of June 22, 2020, Ms. Truesdell became so weak that she could not walk to the restroom, even with Mr. Truesdell's assistance.
43. Ms. and Mr. Truesdell decided that Ms. Truesdell would try to see her primary care provider the following morning.
44. Mr. Truesdell created a makeshift porta-potty for Ms. Truesdell to use throughout the night and placed it beside their bed.
45. At approximately 10:00 p.m., Ms. Truesdell tried to leave their bed to use the porta-potty.
46. After using it, however, Ms. Truesdell could not get back up.

47. Mr. Truesdell decided that Ms. Truesdell needed immediate medical attention. Mr. Truesdell called paramedics.

48. The paramedics arrived, determined that Ms. Truesdell had a low-grade fever, but did not transport her to the hospital, due to COVID-19 restrictions. Paramedics advised that Ms. Truesdell see a doctor as soon as possible.

49. Approximately one hour later, Ms. Truesdell lost the ability to move her legs or arms. She was unable to talk or hold her head up on her own.

50. Mr. Truesdell called the paramedics a second time.

51. When paramedics arrived, Ms. Truesdell could not answer questions or follow commands.

52. The paramedics determined that Ms. Truesdell required emergency medical care and transported her to the St. Joseph's Hospital Emergency Department.

53. After medical providers examined Ms. Truesdell, they determined that Ms. Truesdell's condition was so severe that she needed to be admitted to the hospital ("St. Joseph's").

54. Ms. Truesdell received in-patient care from June 22 to June 27, 2020.

55. While at St. Joseph's, Ms. Truesdell developed a severe rash on her face and torso.

56. Steven Oscherwitz, M.D., an infectious disease specialist, consulted on Ms. Truesdell's case. Dr. Oscherwitz believed that Ms. Truesdell had developed recurring Valley Fever.

57. Dr. Oscherwitz prescribed Fluconazole to treat what he believed to be Valley Fever.

58. Ms. Truesdell's condition slowly improved, because St. Joseph's was providing Labetalol, the correct drug.

59. On June 27, 2020, the hospital discharged Ms. Truesdell and advised her to continue taking her previously prescribed medications and, now, Fluconazole.

60. Ms. Truesdell and her physicians at St. Joseph's did not know, and did not have reason to know, that El Rio had incorrectly dispensed Lamotrigine, or that Ms. Truesdell's severe symptoms resulted from the Lamotrigine's toxicity, not Valley Fever.

*Ms. Truesdell's Post-Discharge Condition*

61. After her discharge from St. Joseph's, Ms. Truesdell continued taking her medications, including the incorrectly prescribed Lamotrigine.

62. Ms. Truesdell took, in combination, Fluconazole, Lamotrigine, and previously prescribed Venlafaxine.

63. After she resumed taking her medication, Ms. Truesdell's symptoms immediately returned.

64. Ms. Truesdell's rashes continued on her arms and legs. She also experienced dizziness, headaches, diarrhea, and hair loss. She felt constantly fatigued, struggled with her balance, and as result, fell at least four times. Ms. Truesdell's skin also began to severely peel.

65. Ms. Truesdell could not return to work and received short term disability.

*Ms. Truesdell Discovers El Rio's Negligence*

66. On July 29, 2020, approximately one month after Ms. Truesdell's inpatient treatment at St. Joseph's, Mr. Truesdell picked up another refill of Ms. Truesdell's Labetalol prescription from El Rio.

67. When Ms. Truesdell opened the bottle, she noticed that the tablets looked like the tablets she typically received (i.e. white and circular), as opposed to the tablets provided in June 2020.

68. Ms. Truesdell searched online, and found that the tablets, dispensed in June 2020, resembled Lamotrigine, rather than her prescribed Labetalol.

69. Ms. Truesdell immediately called El Rio and informed the pharmacy that she believed she had been taking incorrect medication for approximately six weeks.

70. The following day, El Rio confirmed that it had incorrectly dispensed Lamotrigine.

71. Melinda Godoy, El Rio's pharmacy's manager called Ms. Truesdell and apologized to her.

72. Thereafter, pursuant to El Rio's advice, Ms. Truesdell underwent a "step-down" process to wean her off the Lamotrigine.

73. Ms. Truesdell, as a result of El Rio's incorrect dispensation, developed Stevens-Johnson Syndrome and experienced rashes, dizziness, headaches, diarrhea, fatigue, and severe skin peeling.

74. Mr. Truesdell, to date, suffers symptoms, including loss of hair and teeth, fatigue, and skin peeling, as a result of El Rio's incorrect dispensation.

75. Ms. Truesdell also suffers from post-traumatic stress disorder, as a result of El Rio's incorrect dispensation.

## COUNT I
## (NEGLIGENCE AGAINST ALL DEFENDANTS)

76. All previous allegations contained herein are incorporated by reference.

77. At all time relevant hereto, El Rio owed a duty to exercise reasonable care in providing pharmaceutical services to Ms. Truesdell.

78. El Rio breached their duty of care to Ms. Truesdell.

79. El Rio's breach was the direct and proximate cause of Ms. Truesdell's injuries.

80. Defendant United States is liable for El Rio's acts or omissions, pursuant to 28 U.S.C. § 2671, *et. seq.* and 42 U.S.C. § 201, *et. seq.*

81. Defendant United States and El Rio are liable to Ms. Truesdell for damages.

## COUNT II
### (NEGLIGENCE PER SE AGAINST ALL DEFENDANTS)

82. All previous allegations contained herein are incorporated by reference.

83. Pursuant to Ariz. Admin. Code § 4-23-402(A)(11) and (12), a pharmacist must make a final accuracy check of the completed prescription label including verification of medicine and consistency with prescription order.

84. Ariz. Admin. Code § 4-23-402 proscribes specific acts or admissions and was enacted for the protection and safety of the public.

85. Ariz. Admin. Code § 4-23-402 provides a legal standard of care, which El Rio, in providing pharmaceutical services to Ms. Truesdell, must exercise.

86. Defendant El Rio failed to comply with Ariz. Admin. Code § 4-23-402(A)(11) and (12).

87. Defendant El Rio's negligence was the proximate cause of Ms. Truesdell's injuries.

88. Defendant United States is liable for El Rio's acts or omissions, pursuant to 28 U.S.C. § 2671, *et. seq.* and 42 U.S.C. § 201, *et. seq.*

89. Defendant United States and El Rio are liable to Ms. Truesdell for damages.

**WHEREFORE**, Ms. Truesdell is entitled to judgment in her favor and against Defendants for the following relief:

A. Reasonable expenses of necessary medical care, treatment and services rendered, and reasonably probable to be rendered in the future as a result of the injuries;

B. Pain, discomfort, suffering, disability, disfigurement, mental anguish, and anxiety already experienced and reasonably probable to be experienced in the future as a result of Ms. Truesdell's injuries;

C. Past and future loss of enjoyment of life;

D. Costs and attorney's fees;

E. Any and other such relief the Court deems just and proper.

DATED this 23rd day of May 2022.

**GOLDSMITH & MENDOZA, PLLC**

By: */s/Maria del Pilar Mendoza*
Eugene N. Goldsmith
Maria del Pilar Mendoza
*Attorneys for Plaintiff*

THE FOREGOING e-filed/delivered via PACER this this 23rd day of May 2022 to:

United States District Court
For the District of Arizona

By: */s/Leticia Quijada*
Leticia Quijada

11

## VERIFICATION

FLORENCE TRUESDELL declares:

1. That I am the Plaintiff, in the above-entitled cause; and

2. That I have read the foregoing Complaint and that I am familiar with the contents thereof; and that the Complaint and contents thereof are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on this 19th day of May, 2022.

*/s/ Florence J. Truesdell*

FLORENCE TRUESDELL